# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

                Plaintiff,

v.

WAYNE D. GRILLS,

                Defendant.

Case No. 18-CR-228-JPS

**ORDER**

On December 11, 2018, a grand jury returned a four-count indictment charging Defendant Wayne D. Grills ("Grills") with kidnapping, sexual assault, unlawful possession of a firearm, and victim intimidation. (Docket #1). The Defendant filed three motions to suppress and one motion to dismiss, all of which were fully briefed before Magistrate Judge David E. Jones. (Docket #14, #15, #17, #18). Magistrate Judge Jones issued reports and recommendations on each motion, and the parties subsequently filed objections and responses with this Court.

On July 23, 2019, the government filed a superseding indictment, charging Grills with the same four counts of conduct, but clarifying that the victim intimidation charge was made with reference to communication with a law enforcement officer or judge *of the United States*, in order to establish a federal jurisdictional nexus for the crime. *See* (Docket #29, #31 at 3–4). The superseding indictment moots the motion to dismiss, (Docket #18), as well as Magistrate Judge Jones's recommendation of dismissal. (Docket #31). The other reports and recommendations are ripe for review. For the reasons explained below, Magistrate Judge Jones's recommendations will each be adopted in large measure.

1.     **STANDARD OF REVIEW**

When reviewing a magistrate's recommendation, this Court is obliged to analyze *de novo* "those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). The Court can "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." *Id.* The Court's review encompasses both the magistrate's legal analysis and factual findings. *Id.*; *see also* Fed. R. Crim. P. 59(b).

2.     **RELEVANT FACTS**

The parties do not object to Magistrate Judge Jones's statement of facts, so those facts will be adopted in full and substantially inserted below, from Docket #27 at 2–3; Docket #30 at 2–3; and Docket #32 at 2–4, for ease for reference.

In the early morning hours of June 9, 2019, a woman called 911 to report that her sister, A.L.K., had been forcibly taken from her home in Greendale, Wisconsin, by her ex-boyfriend, Wayne Grills. *See* (Docket #21 at 5). Greendale police obtained a cell phone number for Grills: (773) XXX-XXXX. (Docket #17-1 at 7). When they called that number A.L.K. answered, her voice sounding shaky and like she had been crying. *Id.* A.L.K. stated that she was driving around with Grills and that she was okay. However, it appeared to the police that A.L.K. was being coached on what to say and that she was in danger. *Id.* The police also spoke twice with Grills. He agreed to report to the Greendale Police Department but never showed.

A few hours later, the police spoke with A.L.K.'s sister. *See id.* at 8. The sister indicated that A.L.K. had called her from telephone number (847) XXX-XXXX at 5:37 a.m. *Id.* AL.K. told her sister that she was at a gas station in Illinois and that she was okay. A.L.K. called her sister from the same

number at 6:23 a.m. Investigation revealed that the 847 and the 773 numbers were both associated with Grills. *Id.* The police tracked the 773 number to an area near Grills's listed address in Melrose Park, Illinois at 5:59 a.m. *Id.* at 7–8. They also received a call from Grills's tenant/roommate, D.F., who reported hearing Grills's voice inside their attached garage. (Docket #21 at 2).

At about 7:26 a.m., members of the Melrose Park Police Department (MPPD) arrived at the residence, and D.F. gave officers keys to open the locked garage. *Id.*; (Docket #25 ¶2). Inside the garage, the police located Grills, A.L.K., and Grills's van. *Id.* Grills was immediately arrested and handcuffed. *Id.* ¶ 3. The police patted him down and seized from his person a wallet, keys, and a Galaxy 7S cell phone. *Id.* ¶ 14. The scene was secure by 7:32 a.m. *Id.* ¶ 3. Grills was then placed in custody and taken to the MPPD. *Id.* ¶ 4. The squad left the scene with Grills at 7:39 a.m. and arrived at the police station at 7:41 a.m. *Id.* After Grills was removed from the scene, the police saw and seized a Galaxy S5 cell phone that was laying on a workbench in the garage. *Id.* ¶ 15.

At approximately 7:48 a.m., A.L.K. told police that Grills had been armed with a gun during the alleged kidnapping. *Id.* ¶ 6. A.L.K. indicated that Grills had her hide the gun inside his outdoor doghouse. *Id.* The doghouse was in Grills's backyard and within the curtilage of his home; the backyard is enclosed by the home, the garage, fences, and gates. *Id.* ¶ 7. Officers then entered the backyard, walked to the doghouse, and removed a blanket that covered the entrance to the doghouse. *Id.* ¶¶ 8–10. Inside the doghouse, officers observed a gun, which they photographed and seized. *Id.* ¶¶ 10, 12. Later that day, A.L.K. stated during an interview that she did not know whether the gun was loaded or real. *Id.* ¶ 11.

Grills's van was towed to the police station and held as evidence. *Id.* ¶ 16. Five days later, the police obtained a state-court warrant to search the van for evidence related to aggravated criminal sexual assault, based on A.L.K.'s subsequent statements. (Docket #15-1). The police then searched the van and seized items from it, including a carpet sample that was tested for the presence of biological samples and DNA. (Docket #15 ¶ 3).

The S5 phone, which was found on the workbench, was given to Greendale police to be held as evidence. (Docket #25 ¶ 17). The S7 phone, which was found on Grills's person, remained in the custody of the Melrose Park police until July 9, 2018, when it was turned over to a Bureau of Alcohol, Tobacco, and Firearms ("ATF") agent and a Greendale police detective. *Id.* ¶ 21. While in custody, Grills repeatedly asked his daughter and his cousin to retrieve his property, including his phones. *Id.* ¶ 18. The police regularly listened to those recorded jail calls and wrote summaries of the calls. *Id.* ¶ 19. However, the Melrose Park police refused to return any property. *Id.* ¶ 20.

On August 3, 2018, Luke Barker, a Special Agent with ATF, applied for warrants to search the S5 and S7 phones for evidence relating to the unlawful possession of a firearm and kidnapping. (Docket #17-1 at 4–18; Docket #17-2 at 4–18). The affidavits submitted in support of the search-warrant applications appear to be identical. Therein, SA Barker recounted the details of the kidnapping, as described by A.L.K., her daughter, and her sister. *Id.* at 6–11. The affidavits state that A.L.K. left her apartment without her purse, keys or cellular phone. *Id.* at 7. The affidavits, however, do not explain how law enforcement came into possession of the phones, stating only that they were located at the Greendale Police department. *Id.* at 6, 11. Magistrate Judge Jones authorized the warrants later that afternoon.

3.    **ANALYSIS**

3.1    **Motion to Suppress Firearm**

The Fourth Amendment establishes "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "With few exceptions," warrantless searches of a home are unreasonable. *Kyllo v. United States*, 533 U.S. 27, 31 (2001).  These few exceptions generally relate to the body of law regarding "exigent circumstances," which allows law enforcement to enter a home without a warrant when necessary to pursue an escaping suspect, to address an emergency to life or limb, or to prevent the imminent destruction of evidence. *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 557 (7th Cir. 2014). The mere likelihood that a dangerous weapon is in a house does not constitute an exigent circumstance. *Groh v. Ramirez*, 540 U.S. 551, 559 (2004). Indeed, "a warrantless entry to search for weapons or contraband is unconstitutional even when a felony has been committed and there is probable cause to believe that incriminating evidence will be found within." *Id.* (citing *Payton v. New York*, 445 U.S. 573 (1980)).

The government argues that there were exigent circumstances that constituted an exception to the warrant requirement. Specifically, they argue that the gun in the doghouse posed a risk to public safety and to the officers on the scene, and that because some time had elapsed between when A.L.K. put the gun in the doghouse and when the police arrested Grills, they were not sure whether the gun had become more unsafe. They cite *United States v. Webb*, 83 F.3d 913 (7th Cir. 1996) and *United States v. Henderson*, 553 F.3d 1163 (8th Cir. 2009) in support of their rationale.

In *Webb*, an officer responding to a bar fight witnessed a suspect outside the bar in question pointing a shotgun at his opponent. 83 F.3d at

915. When the suspect saw the police, he "went to his parked car, threw the shotgun he was holding in the open trunk, and then slammed the trunk lid closed. The keys were left in the trunk lock." *Id.* After securing the scene, the officer used the keys that were hanging in the lock of the trunk to retrieve the gun, activate the safety, and remove the ammunition. *Id.* The Seventh Circuit held that this was a lawful search under the automobile exception to the warrant requirement, which "permits the search of a vehicle without a warrant if there is probable cause to believe that the car contains contraband or evidence." *Id.* at 916. In the alternative, the Seventh Circuit noted that the exigent circumstances exception could apply to this situation "[b]ecause the keys were still in the trunk's lock, it was reasonable for [the officer] to believe that the gun posed a safety risk to the public. Left unattended, the gun easily could have been retrieved by anyone passing the car." *Id.* at 917.

This case does not pose the same public safety concern as the loaded shotgun in *Webb*, which was publicly deposited into the trunk of a car and left with keys dangling in the trunk lock, inviting passersbys to open it. In this case, the gun was hidden in a structure in a private backyard. Moreover, only A.L.K. and Grills are alleged to have known about the gun, and the doghouse itself was only reasonably accessible to residents of the townhouse. The private nature of the doghouse, the low level of foot traffic around it, and the fact very few people knew a gun could be found there differentiate the risk in this case from that in *Webb*.

In *Henderson*, officers responded to a report that a man with a loaded gun was acting suspiciously around a house where he believed that his wife was cavorting with another man. A witness at the scene claimed that the man had been threatening "to kill him," apparently referring to the wife's

suspected paramour. 553 F.3d at 1164. The officers somehow gained entry to the house and made their way to the bedroom, where the man was believed to be with the gun and his wife. *Id.* The officers knocked on the door, but the lights went out and the parties on the other side stopped talking. *Id.* The officers entered the bedroom, arrested the man, and, upon conducting a search incident to arrest, found a gun in the bedsheets. *Id.* at 1165. The Eighth Circuit determined that the search was constitutional because "officers who have a legitimate concern for their safety or for the safety of others may search areas that may conceal a threat to them without a warrant." *Id.* (citing *United States v. Poe*, 462 F.3d 997, 1000 (8th Cir. 2006)). The Eighth Circuit acknowledged that although the man was in custody, the "highly volatile" nature of domestic disturbances, and the fact that the officers had reason to believe that a loaded gun was in the room, justified the search. The facts in Grills's case are unlike those in *Henderson*, where another party to the scuffle could have quickly obtained and used the gun against the police. In this case, the suspect was arrested, the victim had been taken away, and the only other person on the premises—the roommate—was inside the home and had cooperated with the police. Additionally, the police did not know if the gun was real, much less loaded. The exigency identified in *Henderson*—that another person could grab the loaded gun and put an officer's life at risk—simply was not present.

The government argues that they did not know who else had access to the firearm between the time that A.L.K. hid it in the doghouse and Grills was arrested. But there are no facts to suggest that someone else could have, and would have, wandered into the backyard, gone into the doghouse, and obtained or tampered with the gun. The government speculates, but wholly fails to provide support for the possibility, that this exigency existed.

Magistrate Judge Jones cited *United States v. Mallory*, 765 F.3d 373 (3d Cir. 2014) and *United States v. Simmons*, 661 F.3d 151 (2d Cir. 2011) in support of the proposition that an exigency ends when the defendant is in custody. The government argues that *Mallory* and *Simmons* are distinguishable because there, the premises were secure, whereas in this case, although the police had secured the garage, they had not yet secured the backyard, where the gun was alleged to be. However, *Mallory* and *Simmons* illustrate that it is difficult to make a colorable "exigency" argument once a defendant is in custody, particularly when the premises can be easily secured until a warrant is obtained.

In *Mallory*, an armed suspect fled law enforcement into his home. 765 F.3d at 377. The officers chased him inside and searched the entire house for him. *Id.* Once the officers found him, arrested him, and secured the scene, they nevertheless continued to search for the gun that they believed him to have. *Id.* at 378. The Third Circuit upheld the district court's determination that once the suspect was arrested and removed from the home, the exigency permitting the warrantless search of the house ended—therefore, the police needed a warrant to continue searching the home. *Id.* at 386–87. The solitary fact that a gun remained in the house did not, itself, constitute an exigency. *Id.* at 387. The logic supporting that conclusion bears out here: once Grills was in custody, the solitary fact that a gun possibly remained on the premises did not, itself, permit a warrantless search.

*Simmons* lends support to this conclusion. In *Simmons*, the Second Circuit determined that there was no safety exigency that justified a warrantless search of a suspect's bedroom—despite the fact that police knew a gun was in the bedroom—when the suspect was removed from the bedroom, arrested, and the entire apartment (including the door to the

bedroom) was guarded by officers. 661 F.3d at 157–58. The Second Circuit opined that "there [was] nothing to suggest that it would have been impracticable to continue securing the bedroom during the time necessary for one of the officers to obtain a warrant." *Id.* at 158. Those same circumstances exist here. Although perhaps the area around the doghouse was not secure, there was no reason why the police could not have placed one officer outside the doghouse, which was a mere five to eight feet from the already-secure garage, in order to secure it. These cases demonstrate that the exigency exception to the warrant requirement did not exist in this situation. Therefore, the Court agrees with Magistrate Judge Jones's analysis, and will adopt his recommendation to suppress the firearm.

The Court takes this moment to address the government's newly raised arguments. In its objection to the report and recommendation, the government, for the first time, argues that the gun was properly seized during a protective sweep; that the police reasonably believed they had consent to search the dog house; and that the firearm should not be excluded because it would have been discovered anyway.

It is the policy of this branch of the Court that, when a motion is before a magistrate judge for the issuance of a recommendation, the parties must include all relevant evidence and legal argument they wish to offer in their submissions to the magistrate. Any argument or objection that was not presented, in full, to the magistrate in the first instance will be deemed waived. The Court will not consider arguments raised for the first time in an objection to the magistrate judge's recommendation when they could have, indeed should have, been raised earlier. As Magistrate Judge Duffin recently explained, "[p]ermitting a party a do-over when things do not go as hoped negates the efficiencies gained from referring matters to a

magistrate judge for a recommendation." *United States v. De La Vega*, 18-CR-40, 2018 WL 8545862, at *2 (E.D. Wis. Dec. 3, 2018).

Here, despite stipulating to a statement of facts, the government now appends an additional statement of facts to its response, and uses these additional facts to buttress arguments that it raises for the first time in its objections. The government has not offered any explanation for its failure to raise these arguments earlier. Moreover, the government has not explained why it failed to include these additional facts in the original stipulation of undisputed facts. As discussed above, this branch of Court does not permit such conduct. The Court deems the government's arguments regarding protective sweep, consent, and inevitable discovery as waived. *United States v. Melgar*, 227 F.3d 1038, 1040 (7th Cir. 2000) (holding that "arguments not made before a magistrate judge are normally waived.").

### 3.2     Motion to Suppress Items from Car and Garage

In his second motion to suppress, Grills argues that the van was unconstitutionally seized and searched because its evidentiary value was not immediately apparent, and because the five-day delay in securing a warrant was unreasonable. As discussed below, the Court will adopt Magistrate Judge Jones's recommendation because the facts indicate that the van's evidentiary value was immediately apparent, and because the five-day delay in securing the search warrant for the van was not so unreasonable as to infringe on Grills's Fourth Amendment rights.

#### 3.2.1   Plain-View Doctrine

When conducting a lawful search, officers are entitled to seize items outside the scope of the warrant if those items are out in the open, or in plain view. "The plain-view doctrine applies if the officer is lawfully

present, the item is in plain view, and the item is immediately incriminating." *United States v. Minney*, 869 F.3d 505, 506 (7th Cir. 2017). "If, however, the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object," then the plain-view doctrine does not justify its seizure. *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993); *Arizona v. Hicks*, 480 U.S. 321, 328 (1987) (holding that the plain-view doctrine did not apply when officers shifted equipment around, without probable cause, to determine if the equipment was stolen).

The parties' main dispute is whether it was immediately apparent that the van was incriminating. Grills objects that the evidentiary value of the van was not immediately apparent because there was "nothing in the record explaining why these officers made the decision to seize the van." (Docket #37 at 2). They contend that, at the time of the arrest, A.L.K. had not reported her sexual assault, so the notion that the van may have contained DNA evidence was pure speculation on the magistrate's part. *Id.*

It is undisputed that the police lawfully entered the garage and observed a van parked therein. Magistrate Judge Jones determined that the following facts established "a fair probability" that this van was the same van that Grills had used in the alleged kidnapping, and therefore contained evidence of the alleged crime: First, the van met the color, year, make, model and license plate number of Grills's van. Second, the driver's door was open, there were keys in the ignition, and the exterior of the car was "noticeably wet," suggesting that it had been driven in the morning's rain. These facts were immediately apparent to the officers upon entering the garage, prompting the conclusion that this was the van that Grills had used to kidnap A.L.K. Accordingly, the police had probable cause that evidence

related to the crime—such as DNA or personal items—could be found inside the van. Perhaps the police would not have thought that DNA evidence related to the sexual assault could be found in the van since, as Grills points out, the sexual assault had yet to be reported. However, there was still probable cause that other evidence of the kidnapping could be found in the van. Accordingly, no Fourth Amendment violation occurred when the police seized the van in the garage.

### 3.2.2   Unreasonable Delay in Obtaining Warrant

Once an item is seized, however it cannot be left to languish in an evidence closet (or an impound lot, as the case may be). "When an officer waits an unreasonably long time to obtain a search warrant, in violation of the Fourth Amendment, he cannot seek to have evidence admitted simply by pointing to that late-obtained warrant." *United States v. Burgard*, 675 F.3d 1029, 1035 (7th Cir. 2012). In determining whether a delay is constitutional under the Fourth Amendment, courts will consider the individual's "possessory interest" in the seized object; the state's basis for the seizure; and whether the state "diligently pursued their investigation" following the seizure. *Id.* at 1033. In *Burgard*, the Seventh Circuit held that a six-day delay in obtaining a search warrant of a cellphone for an out-of-custody suspect was not unconstitutional. *Id.* at 1034.

Pursuant to *Burgard*, Magistrate Judge Jones determined that the five-day delay in acquiring a warrant was constitutional under the circumstances. Grills, having been arrested, had a diminished possessory interest in the van because he could not use it. Additionally, as discussed above, the police had probable cause that the van contained evidence related to the kidnapping. Although the government did not have a good explanation for the delay, and could have investigated the van with

"greater diligence and dispatch," Magistrate Judge Jones nevertheless concluded that the five-day delay was "not so unreasonable as to violate the Fourth Amendment." (Docket #30 at 8–9). The Court is not persuaded by Grills's argument that he has a stronger interest in his van than the *Burgard* defendant had in his cell phone, and ultimately agrees with Magistrate Judge Jones's analysis that the search and seizure of the van was reasonable. Accordingly, the motion to suppress the van will be denied.

### 3.3    Motion to Suppress Cellphones

Magistrate Judge Jones recommended suppression of the two cellphones found during the incident—the S7, which was found on Grills's person pursuant to a search incident to a lawful arrest, and the S5, which was found later, on a workbench in the garage—on the grounds that the incriminating nature of the S5 phone was not "immediately apparent;" there was an unconstitutional delay in obtaining warrants to search both cell phones after the seizure, and both warrants were devoid of probable cause and lacked particularity. The government objected to Magistrate Judge Jones's determination that the incriminating nature of the S5 cell phone was not immediately apparent, that the fifty-five-day delay in procuring a search warrant for the seized phones was unreasonable, and that the warrants were deficient. Each objection will be analyzed in turn, below. For the reasons explained herein, the cell phones will be suppressed and Magistrate Judge Jones's recommendations will be adopted in large measure.

### 3.3.1   Reasonable Seizure of Galaxy S5

As with the motion to suppress the van in section 3.2, *supra*, the government here argues that the plain-view doctrine supported their seizure of the S5 phone after Grills was arrested. "The plain-view doctrine

applies if the officer is lawfully present, the item is in plain view, and the item is immediately incriminating." *Minney*, 869 F.3d at 506. The element at issue here is whether the evidentiary value of the second phone, the S5, was immediately apparent to the police investigating the crime. Magistrate Judge Jones determined that it was not, due to the following reasons: the phone was found *after* the police already seized Grills's personal phone on his person; there was no reason to believe that Grills had two phones; and the phone was seized in a common area shared by the roommate.

The government contends that Magistrate Judge Jones did not consider the fact that two phones were used during the course of the incident, and two cell phone numbers were attributed to Grills. Additionally, the police knew, from talking to A.L.K.'s sister, that A.L.K. did not have her phone with her during this incident, so it could not have been hers. Consequentially, when the police entered the garage, where A.L.K. and Grills were located, they would have reasonably expected to find two cell phones on Grills or near his person. As it happened, shortly after Grills' arrest, the second cellphone was found near the van, on a work bench in the place where Grills was arrested. Under the circumstances— which involved two phone numbers registered to Grills, two phones used during the incident, and no obvious third party to whom the second phone could belong—the Court finds that the police had probable cause to believe that the cell phone had evidence of the crime under investigation, and therefore constitutionally seized it. However, the phone must be suppressed for the same reasons the Galaxy S7 must be suppressed, which are explained below.

### 3.3.2 Unreasonable Delay in Obtaining Warrants

As set forth above, to determine whether a delay in obtaining a warrant is constitutional under the Fourth Amendment, courts will consider the length of time of the delay; the individual's "possessory interest" in the seized object; the state's basis for the seizure; and whether the state "diligently pursued their investigation" following the seizure. *Burgard*, 675 F.3d at 1035. This balance between "privacy-related and law enforcement-related concerns" will determine "if the intrusion was reasonable." *Illinois v. McArthur*, 531 U.S. 326, 331 (2001). A longer delay infringes a person's possessory interest and undermines the criminal justice process. *Burgard*, 675 F.3d at 1033. Additionally, to evaluate the strength of a person's possessory interest, courts can consider whether the person "assert[s] a possessory claim" to the item after it is seized, such as "by checking on the status of the seizure or looking for assurances that the item would be returned." *Id*. On the other hand, the government has a stronger interest in items seized on the basis of probable cause, rather than those seized on the basis of reasonable suspicion, and delays in probable cause seizures are considered more tolerable. *Id*. To illustrate this sliding scale, the Seventh Circuit in *Burgard* compared *McArthur*, 531 U.S. at 331, where the Supreme Court upheld the seizure of a dwelling after a two-hour delay in securing a warrant, with *United States v. Place*, 462 U.S. 696, 709 (1983), where the Supreme Court suppressed evidence obtained after a ninety-minute seizure based on reasonable suspicion. *Burgard*, 675 F.3d at 1033.

As to the first factor, Magistrate Judge Jones determined that Grills had a strong possessory interest in his phone because the phone contained business, personal, and financial information about him. The Court agrees with this determination. Not only did the phone contained his sensitive

personal information, unlike the van, *supra*, the phone remained useful to Grills, his family, his business, and any application or company using his phone's information for data, even while he was incarcerated. The simple fact of his incarceration did not diminish his property interest in his phone beyond constitutional protection. Additionally, Grills made repeated inquiries to his family members about the return of his phone. His family members, in turn, contacted the police on several occasions to return the property. (Docket #25 ¶ 18). Yet the phones were kept by law enforcement for fifty-five days, without any reason. This delay infringed Grills's possessory interest in his phones, and undermined the efficiency of the criminal justice process.

The government counters that *Burgard* is highly distinguishable because in that case, the defendant was out of custody and merely under investigation. (Docket #38 at 6). The government cites several cases in support of the proposition that a defendant who is in custody has a diminished interest in seized property, but each case contains vastly different facts and circumstances than the case at hand. *See Bogan v. German*, 774 F. App'x 297, 302 (7th Cir. 2019) (holding that a five hour delay in obtaining warrant did not render seizure of car unconstitutional); *United States v. Sparks*, 806 F.3d 1323, 1342–47 (11th Cir. 2015) (holding that defendants lacked standing to contest a 23-day delay in obtaining a warrant to search a phone because defendants had initially lost the phone, searched for it for three days, and then obtained a new phone, thereby abandoning their possessory interest in the first phone; the three day delay during which they retained a possessory interest was not unreasonable); *United States v. Sullivan*, 797 F.3d 623, 633 (9th Cir. 2015) (holding that defendant had a reduced possessory interest while in custody and did "not claim that

he could have made use of the laptop. . .or that he sought return of his laptop to himself for a third party"); *United States v. Clutter*, 674 F.3d 980, 984 (8th Cir. 2012) (holding that a defendant's possessory interest in his computers was not implicated when he was incarcerated, the seizure was temporary, and the person who was in "actual possession" of the computers consented to their seizure).

Certainly, when Grills was incarcerated, his possessory interest in his phones diminished somewhat. But it was not nonexistent. His actions illustrate the he retained a possessory interest in the phones by seeking to have them returned to himself or to his family, and the record indicates that he diligently followed up with his relatives about the status of his phones. (Docket #25 ¶ 18) (recounting eleven instances over a six-week period in which Grills followed up with relatives about the status of his belongings, including his phones, according to recorded jail calls).

Additionally, the cases do not indicate that once a person is in custody, he automatically forfeits a possessory interest in everything that does not remain on his body while in jail. To find that a person's possessory interest in his phone diminishes beyond constitutional protection the moment he is incarcerated would be like saying a person also suddenly lacks a cognizable possessory interest in his journal, his mail, or his bank account once he is incarcerated. Indeed, there is a clear difference between a van, which a person stops being able to use once he is incarcerated, and a phone, which still serves a person's interests even if it just sits there. *See e.g., United States v. Mitchell*, 565 F. 3d 1347, 1351 (11th Cir. 2009) (noting the other valuable, non-contraband uses for a hard drive that strengthen a person's possessory interest in it); *see also Riley v. California*, 573 U.S. 373, 393–94 (2014) (discussing the range of personal information contained on a

cell phone). The government's argument that a person in custody has a diminished custody interest in his possessions is well-taken. However, the Court is not convinced that Grills's possessory interest in his phones was so diminished by his custodial status that the balance shifts in favor of the government. This is particularly true in light of the lengthy, unjustified delay in obtaining the ultimately deficient warrants, which will be discussed below.

There is no dispute that the police had a strong evidentiary interest in the phones, so the Court turns to the third factor, which is the length of the delay and its justification. Magistrate Judge Jones determined that a fifty-five-day delay in securing the search warrants was unreasonable under the circumstances. The government counters that the nearly two-month delay was reasonable in light of the fact that the investigation shifted from state authorities to federal authorities. They contend that the month before the federal government became involved should not "count" against them. That is not a reasonable outcome. Local and federal authorities working together on a case must be held to the same constitutional standards.

In the alternative, the government cites *United States v. Johnson*, 875 F.3d 1265, 1276 (9th Cir. 2017) in support of their argument that the nearly two-month delay was reasonable. In *Johnson*, the Ninth Circuit found that a one-year delay between the seizure of a parolee's phone and the issuance of a warrant was not unreasonable in light of the fact that the parolee "never sought return of his phone while he was in continuous custody" and there was no evidence of dilatory conduct on the government's part. *Id.* In that case, the ultimate search of the phone was conducted pursuant to a valid

warrant[1] "for which there was ample probable cause." *Id.* Aside from the fact that *Johnson* is readily distinguishable from the facts at hand, this Court is not bound by that case, and, in light of prior Seventh Circuit authority on similar cases, will not follow it.

As Magistrate Judge Jones observed, the United States Attorney's Office became involved in the case in early July 2018, and the case was fully turned over to them on or after July 9, 2018. Weeks later, on July 31, 2018, the phones were turned over to ATF. Throughout that period, Grills and his family members followed up on the status of the phones, seeking their return. Meanwhile, the government had no explanation for these gaps in time. All of the information used in the search warrant affidavits was available to law enforcement on the day of the kidnapping, and the government has not articulated a single reason why the shift from state to federal law enforcement agencies would necessitate such a long delay in securing these (ultimately deficient) warrants. There is simply no reason why local law enforcement, or federal authorities, could not promptly seek the warrants as soon as it was practicable to do so, leading the Court to conclude that the delay was the result of dilatoriness. In light of the foregoing factors, the Court is constrained to find that the delay was unreasonable in violation of the Fourth Amendment.

### 3.3.3 Warrants' Deficiencies

Finally, Magistrate Judge Jones determined that the search warrant affidavits were defective because the affidavits fail to "set forth any facts linking the seized phones to Mr. Grills." (Docket #32 at 17). "When an affidavit is the only evidence presented to a judge in support of a search

---

[1]See discussion in Section 3.3.3, *infra*, regarding the warrants' deficiencies.

warrant, the validity of the warrant rests solely on the strength of the affidavit." *United States v. Peck*, 317 F.3d 754, 755 (7th Cir. 2003). "[S]uppression of evidence seized pursuant to a search warrant that is later declared invalid is inappropriate if the officers who executed the warrant relied in good faith on the issuing judge's finding of probable cause." *United States v. Adams*, 934 F.3d 720, 726 (7th Cir. 2019) (quoting *United States v. Watts*, 535 F.3d 650, 656–57 (7th Cir. 2008)). Often, "[a]n officer's decision to obtain a warrant is prima facie evidence that the officer was acting in good faith." *Id.* (citations omitted). One of the ways a defendant can rebut this presumption is by presenting evidence that "the affidavit submitted in support of the warrant was 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *United States v. Olson,* 408 F.3d 366, 372 (7th Cir. 2005) (quoting *United States v. Leon*, 468 U.S. 897, 924 (1984)). However, "[o]vercoming the presumption of good faith is no small feat, as an officer cannot ordinarily be expected to question a judge's probable cause determination." *Adams*, 934 F.3d at 726 (quoting *United States v. Lickers*, 928 F.3d 609, 619 (7th Cir. 2019)). When a search is made "pursuant to a facially valid warrant issued by a judicial officer," the police violate a defendant's rights "only if reasonably well-trained officers in their positions should have known that the testimony or affidavits they provided in support of the warrants would have failed to establish probable cause, so that they should not have applied for the warrants in the first place." *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 743 (7th Cir. 2003) (citing *Malley v. Briggs*, 475 U.S. 335, 345 (1986)).

The affidavits explain that two phones were used in the course of a kidnapping, and describe the model and serial numbers of the phones sought to be searched. (Docket #17-1, #17-2 at 6–11). However, the affidavits

do not contain information about how or when the phones were obtained, nor do the affidavits explain why the phones were believed to be associated with the numbers contacted during the incident under investigation. In other words, Magistrate Judge Jones correctly determined that the warrants lack probable cause because there are no facts alleging that the phones were related to the numbers contacted during the incident—a necessary logical step to reaching probable cause. The government counters that in order to obtain the information matching the phone numbers to the phone, they would have had to look inside the phone—which would have required a warrant. Obviously, this is not true: they could have called the numbers that were used during the kidnapping and seen if the phones rang. At the very least, the affidavits could have explained where and when the officers found the phones, which would have provided some basis for the magistrate to conclude that these were the phones used in the commission of the kidnapping.

The Court agrees that the probable cause determination was deficient. Typically, the government would be entitled to rely on the warrants in good faith, as they were not "so lacking in indicia of probable cause" as to render reliance on them unreasonable. *Leon*, 468 U.S. at 923. However, the government did not raise this argument before the magistrate, (Docket #21), so it will be deemed waived. This conclusion, however, is of little import, as the phones will be suppressed for the reasons explained in Section 3.3.2, *supra*.

4.      **CONCLUSION**

As discussed in the body of this order, the Court substantially adopts Magistrate Judge Jones's recommendations. As a result, the firearm and the

phones will be suppressed. The van, however, will be admitted into evidence.

Accordingly,

**IT IS ORDERED** that Defendant's motions to suppress firearm (Docket #14) and cellphones (Docket #17) be and the same are hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Defendant's motion to suppress the search and seizure of the garage and vehicle (Docket #15) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Defendant's motion to dismiss Count Four (Docket #18) and Magistrate Judge David E. Jones's report and recommendation that the motion be granted (Docket #31) be and the same are hereby **DENIED as moot**;

**IT IS FURTHER ORDERED** that the parties' objections to Magistrate Judge David E. Jones Jones's Reports and Recommendations (Docket #34, #37, and #38) be and the same are hereby **OVERRULED in part and SUSTAINED in part** in accordance with the terms of this Order; and

**IT IS FURTHER ORDERED** that Magistrate Judge David E. Jones's Report and Recommendations (Docket #27, #30, and #32) be and the same are hereby **ADOPTED** in accordance with the terms of this Order.

Dated at Milwaukee, Wisconsin, this 30th day of October, 2019.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge